```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 5, 2015
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

FLUSHING BANK,                              :
                                            :
                              Plaintiff,    :
                                            :
        -v-                                 :        13 Civ. 9120 (KBF)
                                            :
GREEN DOT CORPORATION & GREEN               :        OPINION & ORDER
DOT BANK,                                   :
                                            :
                              Defendants.   :

------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

This reverse confusion trademark case concerns plaintiff Flushing Bank, owner of the senior word mark iGoBanking and logo trademark, seeking to enjoin Green Corporation's and Green Dot Bank's (together, "Green Dot") use of its junior word mark GOBANK and logo .  Flushing Bank asserts that although it is the senior user, its iGoBanking mark has less brand recognition than Green Dot's GOBANK mark, and that Green Dot has saturated the market with its advertising.  This saturation may, according to Flushing Bank, lead consumers to view it as an infringer; this is of particular concern in the banking market, in which trust is important.

I.      PROCEDURAL HISTORY

On December 26, 2013, plaintiff Flushing Bank filed its initial complaint against Green Dot; it amended that complaint on February 28, 2014.  It asserted five separate causes of action, of which only the first three remain:  trademark infringement arising under 15 U.S.C. § 1114 (First Cause of Action), false designation of origin and unfair competition arising under 15 U.S.C. § 1125(a)

(Second Cause of Action), declaratory judgment for cancellation of trademark and for a determination that certain applications for registration can be denied for likelihood of confusion, arising under 15 U.S.C. § 1052(d) (Third Cause of Action), trademark infringement and unfair competition arising under the common law of New York (Fourth Cause of Action), and trademark dilution arising under New York General Business Law § 360-1 (Fifth Cause of Action). (ECF Nos. 1, 28.)

On January 31, 2014, Green Dot answered and filed a counterclaim seeking cancellation of the iGObanking, iGObanking.com, and design marks.  (ECF No. 14.) Green Dot alleged that Flushing Bank's registration of these marks was the result of fraud in the procurement and that cancellation was thus warranted under 15 U.S.C. §§ 1064(3), 1115(b)(1), and 1119.

The Court has subject matter jurisdiction over this matter pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338.

On June 19, 2014, the Court dismissed Flushing Bank's state law claims. Flushing Bank v. Green Dot Corp., No. 13 Civ. 9120 (KBF), 2014 U.S. Dist. LEXIS 87393, at *11-17 (S.D.N.Y. June 19, 2014). (ECF No. 40.)

On October 1, 2014, the parties consented to proceed with a summary bench trial on the papers, in accordance with Rule 52 of the Federal Rules of Civil Procedure.  (ECF No. 57.)  That same day, plaintiff also filed a motion in limine to exclude the testimony and report of Hal Poret.  (ECF No. 53.)  On October 21, 2014, defendants filed a motion to strike the declaration of Stefanie A. Silvia.  (ECF No. 89.)

According to the trial procedures to which the parties consented, they were each able to submit trial declarations and deposition testimony from witnesses as direct testimony along with documentary exhibits. Each side also had the opportunity to respond to the submissions of the other side with additional declarations and deposition designations. As set forth below, both parties submitted a significant amount of material in this regard.[1] The parties also stipulated to a number of facts. (ECF No. 117, Exh. M.)

Flushing Bank submitted declarations and deposition excerpts from the following witnesses from Flushing Bank: John Buran, President and Chief Executive Office; Caterina dePasquale, Vice President and Director of Strategic Development and Delivery; (ECF No. 82, Exhs. A, B) William Franz, Vice President and former Director of Marketing; Maria Meihoefer, Assistant Vice President of the Internet Banking Department; and Patricia Tiffany, Senior Vice President and Director of Marketing. (ECF No. 117, Exhs. C, F, K; ECF No. 82, Exhs. E, J, N; ECF No. 103, Exh. C; ECF Nos. 59, 86, 126.)[2]

Flushing Bank also designated portions of the depositions of several Green Dot employees including Sharon Pope, Head of Marketing and Steven Streit, Green Dot's CEO and Founder. (ECF No. 117, Exhs. H, J; ECF No. 82, Exh. L; ECF No. 103, Exh. D.)

---

[1] The parties also objected to certain exhibits, declarations, and other evidence. The Court has considered the objections to the documents on which it relied in deciding this Opinion and concludes that they are without merit.
[2] Flushing Bank also submitted a trial declaration from its custodian of records, Damias A. Wilson, attaching cease and desist communications sent to Green Dot. (ECF No. 62.)

Flushing Bank also presented evidence from third party witnesses, including Dr. Marinilka Kimbro and Connie Meeker, both third party witnesses on consumer confusion; Amy Doll, Assistant Vice President and Marketing Director of Valley Bank; Brandie Flann, Chief Operating Officer of Pine River Valley Bank; Steven Ollenburg, President of Modern Woodmen of America Bank; Debra Weyker, Vice President of Marketing at Bank First National; (ECF No. 117, Exhs. A, B, D, E, G, L; ECF No. 82, Exhs. C, D, H, I, K, O) and Arthur Hodges, Senior Vice President Corporate Communications of CoBank (ECF No. 82, Exh. F).

Flushing Bank also submitted a trial declaration from Sean Cashman of Prime Visibility, a digital marketing agency that worked with Flushing Bank on the digital marketing strategy for its iGObanking brand (ECF No. 61), and a declaration from Stefanie Silvia, custodian of records from Bottomline Technologies, Inc., a company which maintains records for Flushing Bank regarding applications submitted for its iGObanking service. (ECF No. 60; <u>see also</u> ECF No 91.)[3]

---

[3] Bottomline was formerly known as "Andera." Thus, references to the "Andera Application Records" are synonymous with those records Silvia references in her declaration.  Green Dot has moved in limine to preclude Silvia's trial declaration on the basis that she was not disclosed by Flushing Bank in its Rule 26 submission. Fed. R. Civ. P. 26(e).  (ECF No. 89.)  Flushing Bank has opposed, arguing principally that Green Dot cannot be prejudiced as it knew of the Andera Application Records for months while discovery was ongoing.  (ECF No. 104.)  Flushing Bank refers to the provision in Rule 26(e) that excuses supplementation of disclosure when information otherwise becomes known to an opposing party. (<u>Id.</u>)

The most significant issue in this case is customer confusion.  Flushing Bank seeks to use Silvia's declaration to authenticate records maintained by Bottomline regarding applications for Flushing Bank's iGObanking service and also to establish that they are business records created and maintained in the ordinary course.  Tiffany and Meihoefer discuss the records Silvia introduces in their declarations and deposition testimony.  (<u>See, e.g.</u>, ECF No. 59, ¶ 64.) While it is true that Flushing Bank was in possession of information about the name of the entity that maintained its records and the records themselves that it failed to fully disclose, it is also true that Green Dot learned of the Andera Application Records during discovery and indeed discussed the existence of the records with Flushing Bank's Meihoefer during her deposition.  (ECF No. 103, Exh. C.)  Green Dot could have pursued the Andera records further through subpoena or otherwise and chose not to.  Green Dot responds that it relied on the fact that Meihoefer had been proffered as Flushing Bank's 30(b)(6) witness on customer confusion and that therefore it needed to look no further. (ECF No. 110.)
(continued)

In addition to the above testimony, Flushing Bank also submitted over 180 trial exhibits. (ECF Nos. 63, 88, 127.)

To rebut Hal Poret, Green Dot's proposed survey expert, Flushing Bank submitted deposition testimony of its cross examination of Poret (ECF No. 117, Exh. I; ECF No. 82, Exh. M), as well as two declarations from Mark Keegan from Keegan & Donato Consulting, LLC, a market research firm that specializes in consumer survey research (ECF Nos. 55, 87).

The Court also received a significant volume of material from defendant Green Dot.  Green Dot submitted declarations and deposition excerpts from a number of witnesses including from Steven Streit, its Founder and CEO (ECF No. 68; ECF 96, Exh. 12) and Sharon Pope, Chief Marketing Officer and former Vice President working with Product Marketing and Interactive Teams (ECF Nos. 69, 94, 102; ECF No. 96, Exh. 11).

Green Dot also submitted deposition excerpts from the following Flushing Bank employees: Patricia Tiffany, (ECF No. 73, Exh. 1; ECF No. 96, Exh. 1) John Buran, (ECF No. 73, Exh. 2) Maria Meihoefer, (ECF No. 73, Exh. 3; ECF No. 96, Exh. 2) William Franz, (ECF No. 73, Exh. 4, Ex. 96, Exh. 3) and Caterina de Pasquale (ECF No. 73, Exh. 5).  Green Dot submitted excerpts of the depositions of some of the same banking third parties that Flushing Bank had, including Brandie

---

The Court declines to preclude Silvia and denies the motion.  There is no real surprise as to the existence and content of the records.  The records were known to the parties.  (See ECF No. 91, Exhs. 2, 3.)  Nor is there any prejudice.  In any event, allowing in Silvia's declaration is not equivalent to admitting the documents for all purposes or suggesting that the Court accords them a particular weight. The Court has read the testimony surrounding the Andera Application Records and is well aware of their limitations.

Flann, (ECF No. 73, Exh. 7; ECF No. 96, Exh. 4) Debra Weyker, (ECF No. 73, Exh. 8; ECF No. 96, Exh. 5) Steve Ollenburg, (ECF No. 73, Exh. 9; ECF No. 96, Exh. 6.) Amy Doll, (ECF No. 73, Exh. 10; ECF No. 96, Exh. 7) and Arthur Hodges (ECF No. 73, Exh. 6).  In addition, Green Dot submitted deposition testimony from two same two consumer witnesses that Flushing Bank asserts were confused, Connie Meeker (ECF No. 73, Exh. 11; ECF No. 96, Exh. 8) and Marinilka Kimbro (ECF No. 73, Exh. 12; ECF No. 96, Exh. 9).

In support of its counterclaims, Green Dot submitted declarations from Tony Yarborough, Vice President of Robert Jackson and Associates, a private investigation firm, (ECF No. 65) and Flushing Bank's former Director of Marketing, William Franz (ECF No. 105, Exh. 13; DX 100).  It also submitted two declarations, a survey report dated July 25, 2014, and deposition testimony from its proposed survey expert, Hal Poret, of ORC International.  (DX 121, ECF Nos. 66, 85; ECF No. 73, Exh. 13.)[4]  Green Dot also submitted it cross examination at deposition of Flushing Bank's proposed rebuttal survey expert, Mark Keegan. (ECF No. 96, Exh. 10.)

In addition to the declarations and deposition excerpts referred to above, Green Dot also submitted over 180 trial exhibits.  (ECF Nos. 72, 95, 100.)

Based on the record presented by the parties, and in accordance with Rule 52, the following constitutes this Court's factual findings and conclusions of law.[5]

---

[4] Flushing Bank has moved in limine to preclude the survey, report and testimony of Poret.  (ECF No. 53.)  Green Dot obviously opposed that motion.  (ECF No. 84.)  The Court discusses and denies that motion below.

[5] The Court's findings of fact as to all matters save Green Dot's counterclaim for trademark cancellation (and Flushing Bank's request for a declaratory judgment on the same issue), are by a preponderance of the evidence.  The

## II.    FINDINGS OF FACT

Flushing Bank is a New York State chartered bank with its principal place of business in Lake Success, New York.  (SF ¶ 1.)[6]  Flushing Bank offers deposit, loan and cash management services at 17 banking locations throughout the New York City metropolitan area.  (ECF No. 59 (Tiffany Decl.) ¶ 8.)  It also operates an online banking division, iGObanking.com. (Id. ¶ 10; SF ¶ 3.)  iGObanking provides online banking services to consumers nationwide.  (SF ¶ 14; ECF No. 59 (Tiffany Decl.) ¶¶ 11, 12; PX 30.) The iGObanking.com service is online only.  It does not have any brick and mortar locations.  (ECF No. 59 (Tiffany Decl.) ¶¶ 30-33.) To open an iGObanking.com account, a prospective customer must fill out an application online or download a paper application and mail it in to Flushing Bank. (Id. ¶ 32.) The iGObanking service offers online checking, savings, and money market accounts, certificates of deposit accounts, debit cards, online bill paying, electronic funds transfer, check and direct deposit, ATM withdrawals, and IRAs.  (Id. ¶¶ 37-38; SF ¶ 14.)

As of July 31, 2014, the iGObanking service had 17,127 accounts and customers residing in all 50 states. (SF ¶¶ 17, 18; ECF No. 59 (Tiffany Decl.) ¶¶ 39-40; PX 30.) Those accounts have an aggregate $298,699,955 on deposit. (PX 30, PX 139.)

---

claim regarding cancellation is determined according to a "clear and convincing evidence" standard.  Orient Exp. Trading Co. v. Federated Dep't Stores, Inc., 842 F.2d 650, 653 (2d Cir. 1988). In making these findings, the Court does not make any credibility determinations.

[6] "SF" refers to the Stipulated Facts, ECF No. 117, Exh. M.

Flushing Bank first began using the iGObanking, iGObanking.com, and the stylized iGObanking.com mark (collectively the "iGObanking Marks") in interstate commerce in connection with online banking services in November 2006. (ECF No. 59 (Tiffany Decl.) ¶ 13.)  At that time, Flushing Bank began offering online banking products through its website, www.igobanking.com. (PX 80.)

A.    Advertising the iGObanking Marks

Flushing Bank does not advertise iGObanking in its brick and mortar locations. (ECF No. 59 (Tiffany Decl.) ¶ 31.)  Its services are advertised through advertising campaigns on the Internet and nationally in print publications.  (Id. ¶ 45.)  Flushing Bank has advertised its iGObanking Marks and services in USA Today and BankRate.com, it has run promotions with 1-800-Flowers.com, TurboTax.com and the Long Island Ducks; it has run banner ads on numerous websites including Google, News12.com, CNN.com, Weather.com, NYTimes.com, HuffingtonPost.com, Reuters.com, Bloomberg.com, BankRate.com, USnews.com, USAtoday.com and YouTube.com. (Id. ¶ 46, PXs 45-49, 76-79, 163.)  In 2007, Flushing Bank spent over $850,000 on iGObanking advertising; that amount has since declined and was roughly $99,000 in 2013. (SF ¶ 16; ECF No. 59 (Tiffany Decl.) ¶ 49.)  As of 2014, however, Flushing Bank had again increased its advertising spending and had spent $150,000 advertising the iGObanking brand through the end of September with $300,000 allotted for the whole year.  (ECF No. 59 (Tiffany Decl.) ¶ 50.)

In 2013, the iGObanking.com site was visited 151,606 times; during the first two thirds of 2014, it was visited 109,616 times. (ECF No. 61 (Cashman Decl.) ¶ 17.) Banner ads for iGObanking.com have received approximately 7 million impressions during the same two years.  (Id.)

B.    iGObanking Marks

On March 23, 2006, Flushing Bank filed an intent-to-use application with the United States Patent and Trademark Office ("USPTO") for the marks iGObanking (Ser. No. 78844046) and iGObanking.com (Ser. No. 78843401).  (ECF No. 59, Tiffany Decl. ¶ 15; PXs 10, 11.)   On October 5, 2006, Flushing Bank filed an intent-to-use application with the USPTO for the stylized iGObanking.com mark

 (Ser. No. 77014934) for use in connection with various online banking services. (SF ¶ 6; PX. 12.)

On October 23, 2007, the USPTO registered the marks iGObanking and iGObanking.com as United States Mark Registration Nos. 3,321,369 and 3,321,366 in connection with online banking services. (ECF No. 59 (Tiffany Decl.) ¶¶ 17, 19; PXs 1, 4.)  Specifically, those marks were registered for use in connection with "[f]ull banking services and online banking services provided via the Internet, namely provision of savings accounts, checking accounts, money market accounts and certificates of deposit; consumer lending services, namely, providing student loans, mortgage loans, installment loans, small business loans, manufactured housing loans, home equity loans, home equity lines of credit and automobile loans; financial investment services, namely, retirement financial planning, mutual funds

9

investment, college savings plans, stock brokerage, brokerage of bonds and securities; and credit and debit card services." (ECF No. 59 (Tiffany Decl.) ¶¶ 18, 20; PXs 1, 4.)

Less than a year later, on April 29, 2008, the USPTO registered the stylized iGobanking.com mark  as United States Service Mark Registration No. 3,419,009, in connection with online banking services.  (ECF No. 59 (Tiffany Decl.) ¶ 21; PX 7.)  That mark and design for use was allowed for the same set of services as those identified above.  (ECF No. 59 (Tiffany Decl.) ¶ 22; PX 7.)

Green Dot has raised a question as to whether Flushing Bank acted fraudulently in obtaining its registrations and certifications.  (See, e.g., ECF Nos. 14, 116.)  Green Dot argues that Flushing Bank claimed services that it neither offered at the time nor expected soon to offer.

Flushing Bank has used the iGObanking marks in commerce in connection with a number of services since 2006. (Id. ¶ 24.)  It has not, however, used them in connection with the following services: consumer lending services, namely providing student loans, mortgage loans, installment loans, small business loans, manufactured housing loans, home equity loans, home equity lines of credit and automobile loans; financial investment services, namely retirement financial planning, mutual funds investment, college savings plans, stock brokerage, brokerage of bonds and securities; credit card services.  (Id. ¶ 25.)  Despite not using the marks in connection with these services, Flushing Bank included all of them in

its Statements of Use for the marks and they were included in the USPTO registrations. (<u>E.g.</u>, PX 1.)

In support of its view that Flushing Bank acted fraudulently Green Dot obtained a declaration from William Franz, Flushing Bank's Director of Marketing for the period spanning 2006-2009. (ECF No. 105, Exh. 13; DX 100.)  In that declaration, Franz stated that when he and Flushing Bank's CEO executed their declarations in connection with the Statements of Use for submission to the USPTO he knew he was attesting to a list that included services that Flushing Bank did not at the time offer in connection with the iGObanking mark. (ECF No. 105, Exh. 13 ¶ 4; DX 100.)

However, at his deposition Franz testified that he did not intend to mislead the USPTO; instead, at the time he executed these statements, he was under the mistaken belief that the Statement of Use should include uses that Flushing Bank had a bona fide intent to offer in connection with the mark within a reasonable period of time. (ECF No. 117, Exh. C (Franz Tr.) 116:19-118:17.)  Similarly, when Patricia Tiffany, Senior Vice President, Director of Marketing at Flushing Bank, signed the Declarations of Use and Incontestability for the iGObanking marks, she was under the mistaken belief that the term "use in commerce" meant only that the iGObanking marks had been used continuously in commerce for at least five years after the date of the original registrations, not that the iGObanking marks were required to be used with all of services listed in the registration. (ECF No. 59, (Tiffany Decl.) ¶ 112.)

On January 17, 2014, Flushing Bank filed requests to amend its registration certificates to delete certain services on which the iGObanking Marks have not been used. (Id. ¶ 109; PXs 3, 6, 9.)  Flushing Bank has since received amended registration certificates that omit reference to services it does not offer in connection with the iGObanking trademark. (Compare PX 1, with PXs 4, 7.)

Flushing Bank has also registered several other trademarks that utilize the "iGO" prefix, including iGOonlinebanking, iGOchecking, iGOsavings, iGOCDs, iGOmoneymarket, iGOdebitcard, and iGOIRAs. (SF ¶ 12; DX 51; ECF No. 59 (Tiffany Decl.) ¶ 28.)

As will be discussed in some detail below, Flushing Bank's online branding is built around the phrase "iGO". It has consistently used the iGObanking word in advertising the service to describe what a person "does" – which, in the first person, is stated as "I go" or "iGO."  (E.g., DXs 63, 64; ECF No. 117, Exh. C (Franz Tr.) 36:17-37:16; Id., Exh. K (Tiffany Tr.) 211:14-212:14; ECF No. 73, Exh. 2 (Buran Tr.) 199:16-201:13.)  The word mark is thus used primarily to describe to the consumer that which he or she can do with the service.

The intended prominence of the phrase "iGO" over the "banking" aspect of the marks is further demonstrated by Flushing Bank's usage.  Since 2007, Flushing Bank has advertised iGObanking by using the word mark as a descriptive phrase – with "I" as the subject, "go" as the verb, and "banking" as the object of a descriptive sentence.  (DXs 57, 63; ECF No. 117, Exh. K (Tiffany Tr.) 209:7-210:21; 218:9-219:4.)  Franz testified that "iGObanking" describes to the consumer what he or she

can actually do – in terms of activity – with the service. (ECF No. 117, Exh. C

(Franz Tr.) 37:9-16.)  Franz testified about a particular advertising campaign run in

USA Today between eight and ten times per year in certain cities in which a textual

focus is on the words "More choices are why iGObanking!"  (Id. 55:17-21, 83:10-

84:12, 86:3-21; DX 99.)

Substantial additional testimony and documentary evidence in the trial

record confirms the use of the mark as described by Franz – as personalized action.

For instance, advertisements include phrases such as "A great rate is why

iGObanking" and "I declare my independence when iGObanking." (DX 63.)  On its

website, the service has used quotations such as "Easy online account management

is why iGObanking," and "A better return on my investment is why iGObanking",

and "Online access to my money is why iGObanking."  (ECF No. 117, Exh. K

(Tiffany Tr.) 216:14-22; DX 64.)[7]  Flushing Bank's CEO testified that the use of

iGObanking in a sentence serves two purposes:  "iGObanking is our brand and a

person going banking is banking."  (ECF No. 73, Exh. 2 (Buran Tr.) 199:16-201:13.)

The iGObanking website has a section described as the "iGOcorner."  Joint

advertisements with third parties in that corner combine the phrase "iGO" with the

product tie-in; an example of this was a tie-in with 1-800-Flowers that used the

URL www.1800flowers.com/igo.  (ECF No. 117, Exh. K (Tiffany Tr.) 137:16-138:7;

138:19-139:2; 140:2-5; 140:16-141:1; 141:19-142:8; 216:14-17; 216:23-217:13; DXs 55,

---

[7] Consumers have adopted this usage, also using the word "iGO" as the subject and verb in a sentence about the service.  For instance, in one document, a potential customer wrote, "IGO just turned me down. . . .  Therefore, IGO to another bank." (DX 79.)

64.)  At various times between 2006 and 2010, the iGObanking website included options titled "iGOopen my account," "iGOlearn more," and "iGOview my account." (ECF No. 117, Exh. K (Tiffany Tr.) 145:19-147:25; DX 56.)  In 2009 Flushing Bank ran advertisements that referred to "the iGOphilosophy." (DX 54.)  Flushing Bank personnel frequently use shorthand for the iGObanking mark is "iGO".  For instance, Tiffany and Buran both spoke in this manner at their depositions (ECF No. 117, Exh. K (Tiffany Tr.) 24:9; 157:3; 176:20; 279:8; ECF No. 73, Exh. 2 (Buran Tr.) 95:9-12; see also DX 57.)

Further confirming the emphasis on the "iGO" phrase is Flushing Bank's registration of additional marks such as "iGOchecking", "iGOsavings," "iGOonlinebanking", "iGOCDs", "iGOmoneymarket," "iGOdebitcard" and "iGOIRAs."  (DX 51.)  Flushing Bank referred to its "iGO services" generally in a cease and desist letter to Modern Woodmen of America. (DX 26.)

Flushing Bank's visual representation of iGObanking reinforces the point. Flushing Bank's stylized iGObanking mark –  – clearly emphasizes two things: the "i" and the "GO".  The lowercase "i" taps into the current public perception that an "i" followed by a word indicates an association with the Internet or otherwise advanced digital technology.  In the logo, the "GO" is further emphasized by the green circle surrounding the word – reminiscent of a green traffic light.  The word "banking" is present but not focal.  The overall impression from both the sound and look of the mark is on the spectrum between literal and descriptive: personal involvement in a financial activity in the digital space.

14

This is in fact the precise impression that Flushing Bank intended.  As Patricia Tiffany testified, "John Buran [Flushing Bank's CEO]…suggested that we insert the letter "I" so that it would have a connotation of both the internet as well as personal – so I go.  So to personalize the brand as well as to – in the early days, I – anything "I" before it tended to infer that it was an internet."  (ECF No. 117, Exh. K (Tiffany Tr.) 110:24-111:5.)  When Buran himself was questioned as to why he proposed to put an "i" at the beginning of the mark he responded "Internet.  There was the iPhone; there was the iPad – maybe not the iPad at that point in time.  There was a lot of 'i's around, and it just seemed like a good move."  (ECF No. 73, Exh. 2 (Buran Tr.) 79:23-80:6.)

Both Tiffany and Buran also testified that the green circle was included as part of the logo because it indicates the action "go".  (ECF No. 117, Exh. K (Tiffany Tr.) 119:8-17; ECF No. 73, Exh. 2 (Buran Tr.) 86:6-8; DX 52-53.)  When Maria Meihoefer was asked what she viewed as the distinctive portion of the mark she responded, "[t]he green circle…because it punches out at you."  (ECF No. 117, Exh. F (Meihoefer Tr.) 262:5-14.)

Flushing Bank's branding efforts have not, so far, led to any significant degree of public brand awareness. Flushing Bank is aware of that fact and attributes it to, in part, lower prioritization and budgetary spend than their competitors. (DX 176; ECF No. 117, Exh. K (Tiffany Tr.) 279:15-280:21.)   Flushing Bank's Strategic Plan for 2014-2016 states that "[l]ack of brand awareness also amplified the difficulty in attracting iGObanking.com balances that are not purely

rate driven.  Out initial entry into Internet banking was as a rate-driven brand, and iGObanking.com was put in place as an alternative funding source to meet loan demand.  As of this writing, initiatives to evolve iGObanking.com to have independent franchise value are on hold given less need for funding at this time as well as the recent procurement of low cost brokered money market accounts and borrowings." (DX 75, p. 23; see also ECF No. 117, Exh. K (Tiffany Tr.) 274:15-275:7.) Other strategic plans state a similar lack of brand awareness. (DXs 76-78.)

Between 2008 and 2013 Flushing Bank decreased its advertising spend for iGObanking.  (ECF No. 117, Exh. K (Tiffany Tr.) 179:6-180:4; DX 60.)  Buran acknowledged the correlation between advertising spend and brand recognition. (ECF No. 73, Exh. 2 (Buran Tr.) 154:1-6.)  Despite a recommendation from its advertising agency to develop television spots to raise brand awareness, the iGObanking brand is not advertised at all on television.  (ECF No. 117, Exh. K (Tiffany Tr.) 222:5-10; 228:7-16; 228:23-25; DX 65.)

C.  Green Dot

Green Dot Corporation is the parent company of Green Dot Bank, an FDIC insured provider of financial products and services.  (ECF No. 68 (Streit Decl.) ¶ 3.) Green Dot's target demographic are low and moderate income families.  (Id.)  Green Dot commenced its business with a pre-paid card originally offered through Rite-Aid in 2001.  (Id. ¶ 5.)  Since that time, it has expanded to nearly 95,000 retail locations nationwide, including Wal-Mart, CVS, Walgreens, Family Dollar, Safeway, Home

Depot, Kmart, 7-Eleven, and many neighborhood financial service centers located in inner-city neighborhoods. (Id. ¶ 6.)

Green Dot has used its Green Circle logo –  – since April 2004.  (DX 129.) The logo is registered with the USPTO, which issued it registration number 3,244,184 in May 2007.  (Id.)  In 2011, Green Dot began a name selection process for its online service. (ECF No. 68 (Streit Decl.) ¶ 10.)  The process included retention of multiple third-party marketing and branding consultants.  (Id. ¶ 11.) The name "GoBank" was recommended by two separate sources. (Id. ¶¶ 12-14.) The GoBank checking account was perceived as an "on the go" bank account. (Id. ¶ 15.) Prior to its adoption of the name, it became aware that Flushing Bank was using the iGObanking trademark, as well as the other "iGO" word marks such as iGOchecking, iGOsavings, iGOCDs, etc. (Id. ¶ 19; ECF 96, Exh. 12 (Streit Tr.) 79:20-82:2.) Green Dot's CEO considered the differences between the marks and the fact that third parties were using similar mark and concluded that there was no likelihood of consumer confusion. (ECF No. 68 (Streit Decl.) ¶ 19.)

Green Dot has used the GoBank mark in connection with a mobile checking account that launched in January 2013.  (SF ¶ 21.) On March 9, 2012, before commencing use of the GoBank trademark, Green Dot Corporation filed an application with the USPTO to register the GoBank word mark for use in connection with banking services, online banking services, and other financial services. (SF ¶ 26.)  On June 7, 2012, before commencing use of the GoBank trademark, Green Dot Corporation filed an application with the USPTO to register

the GoBank logo  for use in connection with the same set of services. (SF ¶ 27.) The USPTO approved that application. (SF ¶ 28.)  On April 24, 2013, Green Dot Corporation filed a "Request to Divide" the GoBank logo application and exclude from the Statement of Use those services that Green Dot was not yet offering in connection with the GoBank logo.  (SF ¶ 29.)  On May 1, 2013, that Request to Divide was accepted and the services in that request were transferred to a separate application.  (SF ¶ 29.)  On June 18, 2013, the USPTO registered the GoBank logo as registration number 4,355,615. (SF ¶ 30; DX 139.) This registration covers a number of services, including: debit card, cash card, and stored value card services; banking services, financing services; cash-acceptance transaction services for supporting the funding of prepaid debit cards; analysis and evaluation of the creditworthiness of individuals; electronic payment services, namely, electronic processing and transmission of bill payment data; providing funds replenishment, banking, and electronic funds transfer services in connection with debit card services that permit card holders to fund debit cards, make online and telephone payment transactions, and pay for consumer services, debts and bills; financial investment services in the field of certificates of deposit; automated teller machine (ATM) services; and other online banking services. (SF ¶ 30; DXs 119, 127, 139.)

In addition to its GoBank logo registration, Green Dot also has pending applications for its GoBank word mark and GoBank design. (SF ¶ 31; DX 126, 128.)

D.     The GoBank Service

GoBank customers access their accounts online – not through brick and

mortar branches.  (ECF No. 68 (Streit Decl.) ¶ 7.)  A GoBank checking account is

FDIC insured.  Customers who have an account can receive a physical MasterCard-

branded debit card and can deposit cash into their accounts at participating retail

locations and deposit checks via mobile phone image capture, that is, photo-based,

deposit capabilities.  (Id. ¶ 8.) GoBank customers have, among other services, fee-

free access to over 42,000 ATMs nationwide, access to a digital bill paying service,

and the ability to send money to third parties.  (Id.)

Green Dot launched its GoBank service on January 15, 2013.  (Id. ¶ 3.)  It

was initially launched in a "Beta" version. (Id.) On the first day of launch, the public

could apply for a GoBank account. (ECF No. 96, Exh. 12 (Pope Tr.) 178:24-179:3.)

The GoBank mobile checking account also launched at this time – and achieved

widespread coverage in the press.  (ECF No. 68 (Streit Decl.) ¶ 7.)   Green Dot's

CEO, Steve Streit, spoke at the initial launch events. (ECF No. 69 (Pope Decl.) ¶ 3;

ECF No. 96, Exh. 12 (Pope Tr.) 44:7-17.) On January 17, 2013, Streit appeared on

CNBC's "Squawk on the Street" to discuss GoBank; this segment was then posted

on both the CNBC.com and MSNBC.com websites. (ECF No. 69 (Pope Decl.) ¶ 5; DX

153.)  Green Dot also posted information about GoBank on its Facebook and Twitter

sites.  (ECF No. 69 (Pope Decl.) ¶ 6.)  In total, from January 15-25, 2013, GoBank

19

had more than 106 placements and up to 177 million impressions.[8] (ECF No. 69 (Pope Decl.) ¶ 7; DX 153.)

From July through October 2013, the GoBank service and GoBank trademark appeared as product placement on fourteen episodes of Season 12 of the television show "Project Runway."  In addition, the GoBank service and trademark were also included in a "prize reel" shown towards the end of each episode when various third-party sponsors are mentioned a final time. (ECF No. 69 (Pope Decl.) ¶ 11.)  "Project Runway" exposed millions of television viewers to the GoBank service and trademark.  (Id. ¶ 12.)   GoBank recorded a 1200% increase in awareness among fashion-oriented consumers between June and September 2013.  (Id.; DX 158; ECF No. 96, Exh. 12 (Pope Tr.) 135:4-24.)

Advertisements of GoBank are often accompanied by a dog mascot.  (ECF No. 69 (Pope Decl.) ¶ 18.)  The iGObanking marks are not seen alongside a dog or any type of mascot.  Green Dot has sought to further the association between its dog mascot and the GoBank service.  In July 2013, it sponsored a dog adoption event during which attendees were informed about the GoBank service. (Id. ¶ 13; ECF No. 96, Exh. 12 (Pope Tr.) 76:21-77:6; 92:22-94:14.)  A number of media outlets covered this event.  (ECF No. 69 (Pope Decl.) ¶ 14.)  Additional sponsorship and advertising involved Barnes & Noble College Bookstores, Action Sports Association, and Austin Pets Alive!  (Id. ¶¶ 15-17.)

---

[8] A placement is defined as a story or article mentioning a topic; an impression is defined as a news outlet's estimated number of visitors who could potentially hear or view that mention. (ECF No. 69 (Pope Decl.) ¶ 7; DX 153.)

Green Dot's extensive advertising of the GoBank service has saturated the market: at least tens of millions of consumers have been exposed to the GoBank service and GoBank trademark. (Id. ¶ 26; DX 158.)  For the period from January 2013 through March 2014, Green Dot's marketing expenditures for the GoBank service were in excess of $1 million. (SF ¶ 35; ECF No. 96, Exh. 12 (Pope Tr.) 198:5-15.)

Between the launch of the GoBank service and the filing of the trial papers, tens of thousands of people registered for the service.  (SF ¶ 36.) Green Dot has received significant positive feedback about GoBank's quality.

E.      Events Before This Litigation

On July 25, 2013, Flushing Bank sent a cease and desist letter to Green Dot concerning the GoBank trademark. (SF ¶ 43.)  Shortly thereafter, Flushing Bank commenced a cancellation proceeding (No. 92057778) with the U.S. Trademark Trial and Appeal Board ("TTAB"), seeking cancellation of Green Dot's trademark registration for the GoBank logo.  (SF ¶ 46.)  That proceeding has been suspended pending the outcome of this litigation. (SF ¶ 47.)  This action was commenced on December 26, 2013. (SF ¶ 48.)

F.      Consumer Confusion

The Court finds that while there is some evidence of actual consumer confusion, there is insufficient evidence to support a finding that an "appreciable" number of consumers have been or are likely to be confused as to any association or connection between the iGObanking and GoBank marks or services.  See Savin

Corp. v. Savin Grp., 391 F.3d 439, 456 (2d Cir. 2004) ("[T]he crucial issue in an

action for trademark infringement ... is whether there is any likelihood that an

appreciable number of ordinarily prudent purchasers are likely to be misled, or

indeed simply confused, as to the source of the goods in question." (alteration and

omission in original) (quoting Mushroom Makers, Inc. v. R.G. Barry Corp., 580 F.2d

44, 47 (2d Cir. 1978) (per curium))).

The most persuasive evidence of actual confusion is found in the trial

declarations of Maria Meihoefer, Flushing Bank's Assistant Vice President of

Assistant Manager for the Department of Internet Banking.  (ECF Nos. 83, 126.)

Meihoefer oversees Flushing Bank's Internet Banking Call Center. (ECF No. 126

(Meihoefer Decl.) ¶ 5.) The first trial declaration relates to a single incident of which

Meihoefer has first-hand knowledge.  In that instance, Flushing Bank received an

application for an iGObanking account on which the applicant indicated that he had

learned about iGObanking.com by way of Wal-Mart.  (ECF No. 83 (Meihoefer Decl.)

¶ 7.)  Meihoefer called the applicant back and learned that he had in fact seen an

advertisement for GoBank at a Wal-Mart in Lubbock, Texas.  (Id. ¶ 11.)

With the Court's permission, Meihoefer provided a second trial declaration,

on March 20, 2015.[9]  (ECF No. 126.)   In this declaration, Meihoefer outlines eight

instances in which callers to the Center inquired about activing or re-activing

GoBank cards purchased at Wal-Mart. (Id. ¶ 6 (Nov. 7, 2014); ¶ 7 (Nov. 20, 2014); ¶

---

[9] Following final submissions for the trial, Flushing Bank informed the Court that it had received additional information indicating instances of actual confusion.  (ECF No. 124.)  The Court allowed Flushing Bank to make a submission of such evidence and provided Green Dot with an opportunity to respond.  (ECF No. 125.)  Accordingly, the evidence submitted in connection with those filings are part of the trial record in this matter.

8 (Dec. 15, 2014);  ¶ 11 (Dec. 30, 2014); ¶ 12 (Jan. 1, 2015);  ¶ 13 (Jan. 14, 2015); ¶ 14 (Jan. 15, 2015); ¶ 15 (Jan. 20, 2015); ¶ 16 (March 10, 2015).)[10]  Flushing Bank does not advertise its iGObanking Marks or services at or connected with Wal-Mart. (Id. ¶ 10.)  Meihoefer did not herself speak to any of these callers; information regarding the calls was relayed to her from others. (ECF No. 117, Exh. F (Meihoefer Tr.) 164:10-169:2, 171:9-172:14, 176:1-3.)

Green Dot has objected to the admissibility of Meihofer's declaration and accompanying exhibits.  (ECF No. 128.)  Green Dot's primary objection is that the documents constitute inadmissible hearsay.  Flushing Bank responds that it seeks to use the documents for a non-hearsay purpose.  Flushing Bank is correct.  The forms attached to the Meihoefer declaration and reflecting the calls she discusses are not offered for the truth of what a caller said, but rather for the fact that he or she said it at all.

Additional evidence of alleged actual confusion is less persuasive.  Meihoefer also testified to approximately 13 other telephone calls Flushing Bank had received: two in July 2013, five in August 2013, five in September 2013, and one after that. (ECF No. 117, Exh. F (Meihoefer Tr.) 164:10-169:2; 171:9-172:14; 176:1-3.) Meihoefer conceded that she was not sure who took three of the 13 calls, that the

---

[10] Three of these instances are accompanied by declarations from the representative who received the call and filled out a form with information reflecting the customer inquiry; otherwise, Meihoefer is reporting on the content of a form written out by an unidentified customer service representative. (ECF No. 126 Exhs. A, B.)

bank has no record of any of these calls, it did not retain the names or contact

information as to any of them.  (Id. 75:3-7; 169:11-170:1; 171:25-174:25; 178:2-10.)[11]

Flushing Bank has proffered additional evidence of consumer confusion from

applications forms.  The vast majority of applications for the iGObanking service

are filled out online.  (Id. 228:10-229:9.)  The forms contain the question "How did

you hear about iGObanking.com?"  (DX 41.)  Flushing Bank acknowledges that

applicants answer this question incorrectly in 3-5% of all applications. (ECF No.

117, Exh. F (Meihoefer Tr.) 130:23-133:19; 134:17-136:18; 138:9-25.)  Four

applicants answered the question "Project Runway."  (ECF No. 59 (Tiffany Decl.) ¶

61.)  Flushing Bank's Senior Vice President, Patricia Tiffany, testified that during

the period Season 12 of Project Runway aired, Flushing Bank saw an increase in

the number of applications to iGObanking that listed that the applicant had heard

---

[11] Green Dot has argued that most of the applications and reports of calls from customer service representatives should be excluded as inadmissible hearsay.  While the Court agrees that they are inadmissible, the Court's analysis would be the same even if they were admitted.  As set forth below, the Court's ultimate conclusions in this matter do not depend on whether or not these are considered instances of consumer confusion.

The Court's hearsay analysis is based on the fact that, with regard to these 13 calls, Flushing Bank clearly seeks to offer these statements for the truth, not just for the fact that the consumer made the statement.  Flushing Bank wants to rely on statements identifying the source as "Project Runway" to establish that the caller had in fact seen a service advertised on Project Runway; so too with the other statements by callers.  The fact that the calls were made is irrelevant if the statements were not true, see Howley v. Town of Stratford, 217 F.3d 141, 155 (2d Cir. 2000), as neither the callers' nor the listeners' states of mind are at issue.  See Cameron v. Comty. Aid for Retarded Children, Inc., 335 F.3d 60, 65 n.2 (2d Cir. 2003).  As hearsay, the next question for the Court is whether the statements fit within a hearsay exception.  They do not.  The rules regarding hearsay are fundamentally concerned with reliability.  See Schering Corp. v. Pfizer, Inc., 189 F.3d 218, 232-33 (2d Cir. 1999).  The exceptions to the rules against the admissibility of hearsay are concerned with instances in which the circumstances in which the out of court statement was made indicate a basic level of reliability.  See id.

Here, there is no evidence to assuage the usual reliability concerns that surround hearsay statements. There is also an additional particularized issue of unknown accuracy – and a certain amount of likely inaccuracy – that further detracts from the reliability of these statements.  Meihoefer, a Flushing Bank employee, testified that there was no documentation at all of the "Project Runway" calls and that, in her experience, customers could be careless when reporting how they learned of a bank.  (ECF No. 117, Exh. F (Meihoefer Tr.) 75:3-7, 131:18-133:19.)  In addition, Flushing Bank's own survey expert has stated that even consumers self-report incorrectly from time to time. (ECF No. 96, Exh. 10 (Keegan Tr.) 194:8-195:21.)  There is no way to test the accuracy of what the Flushing Bank customer service representative wrote down.   The Court therefore discounts the 13 instances of alleged confusion in summer 2013.

about the service through the television.  (Id. ¶ 63.)  The Court gives this evidence little weight as Tiffany does not have firsthand knowledge of any of the applications – she relies entirely upon the results of a culling of files conducted by Flushing Bank's third party vendor, Bottomline (also referred to as Andera.) (See also ECF No. 86 (Tiffany Decl.) ¶ 9.)  Flushing Bank's 30(b)(6) deponent, Meihoefer, testified that Flushing Bank was not asserting that applicants who merely listed "TV" as the source of awareness of the service were actually confused.  (ECF No. 117, Exh. F (Meihoefer Tr.) 120:3-121:2; 122:2-19; 125:15-21.)[12]

In addition, three applicants who filled out an online form and answered the question "how did you hear about us" mentioned "Rite Aid," "MetroPCS" or "CVA". (DX 38.)  Flushing Bank asserts that the Court should infer that these are additional instances of actual confusion since it does not advertise its iGObanking service in any brick and mortar location, including these, but Green Dot has.  The Court is unpersuaded.  Green Dot has proffered persuasive evidence that the advertising it has done in certain stores could not account for the statements on the application forms as (1) either the applicant was not an area in which it advertised, or (2) its physical store advertising campaign had not even commenced at the time the form was filled in. (ECF No. 69 (Pope Decl.) ¶¶ 27-30.)

Notably, but for two individuals Meihoefer called, Flushing Bank did not interview any of these applicants to confirm any confusion.  This also means that

---

[12] Consumers have been known to answer "TV" to questions regarding how they heard about a brand, even when the brand has not advertised on television.  (DXs 144, 145.)

there is no evidence in the record as to whether any one of these applicants was in fact a "reasonably prudent purchaser," as the law requires.  See Star Indus., Inc. v. Bacardi & Co. Ltd., 412 F.3d 373, 383 (2d Cir. 2005) ("To prevail in a trademark infringement action under the Lanham Act, a plaintiff must prove, in addition to protectability of the mark, 'a probability of confusion, not a mere possibility,' affecting 'numerous ordinary prudent purchasers.'" (quoting Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1077 (2d Cir. 1993)).  Not all purchasers are reasonably prudent purchasers – some may be impulsive, thoughtless, uninformed, and the like.  Thus, the fact of an application can only take us so far.  Indeed, the applications may have been merely idle interest and not part of a serious purchasing exercise.

Connie Meeker and Marinilka Kimbro, the two individuals whom Flushing Bank did contact were among the four applicants who listed "Project Runway" as the source of their information about iGObanking.  Both were deposed in this action.  The Court finds that based on the testimony, Kimbro was confused but Meeker was not.  In any event, their testimony does not establish actual or likely confusion of an appreciable number of consumers.   Meeker realized her error shortly after seeing GoBank referenced on "Project Runway" and mistakenly going to the iGObanking website.  (ECF No. 117, Exh. E (Meeker Tr.) 12:1-24, 13:18-20, 14:11-12.)  She never opened an account.  Kimbro similarly saw GoBank on "Project Runway" – performed an Internet search and was led to the iGObanking website;

she did open an account and was not impressed with the experience.  (Id., Exh. D

(Kimbro Tr.) 11:1-6, 26:1-28:9, 43:12-44:19, 51:7-11, 54:13-22, 56:10-14.)

Based on the totality of the evidence, the Court finds it more likely than not

that, in context, a small, non-appreciable number of callers mistakenly called

Flushing Bank's iGObanking customer service line as opposed to Green Dot.[13]  As

discussed, certain of those instances involved applicants indicating an association of

Green Dot's "Project Runway" advertisements with iGObanking.  Even so, the Court

has no evidence as to whether the four "Project Runway" applicants were

reasonably prudent purchasers, and as a result discounts the weight they are due.

And as discussed, several other callers had apparently acquired cards and were

following up with additional questions; the Court assumes, for present purposes,

that that context supports those callers as reasonably prudent purchasers.  Taken

altogether, this is insufficient evidence to ground a finding that an appreciable

number of consumers are or are likely to be confused.[14]  The denominator is

important: the total number of consumers exposed to the Green Dot advertising was

in the many millions; if only a dozen or so people who then sought additional

information were confused, that number indicates an extremely low level of

---

[13] Importantly, as to the eight Wal-Mart card callers, there is nothing in the record that any of the callers were seeking to avail themselves of any particular additional banking services; instead, they had their cards and were seeking customer service assistance.  In other words, there is nothing in the record to suggest that these callers were "in the market" for any online banking service.  This decreases the value of these calls as instances of confusion as the consumer was not in a position to compare and contrast the services offered by the senior and junior user of the mark, or to consider whether the senior was an infringer and have that impact a purchasing decision.  The callers just wanted to be pointed in the right direction.

[14] If the Court's math as to these instances totaling approximately a dozen is incorrect by some small number, that is irrelevant to the Court's decision.  The reasoning upon which the Court's determination is based would apply nonetheless.

confusion.  Indeed, this experienced rate of confusion is likely no higher than a rate of "wrong number" before the Internet.  If the Court examines the number of instances from the perspective of Flushing Bank, the number of consumers expressing possible confusion remains de minimis.  Flushing Bank has conducted some advertising of its iGObanking service, and has over 17,000 account holders.  Against this backdrop, these instances of actual confusion remain de minimis.

G.  <u>Green Dot's Survey</u>

Survey results further confirm that there is only a de minimis likelihood of actual or likely confusion.  Flushing Bank – the entity alleging consumer confusion – did not provide a survey in supports of its claims.  Green Dot did. The Court credits the results of Green Dot's survey and finds that they confirm the paucity of evidence of actual confusion, as discussed above, is due to a low likelihood of confusion generally.

Hal Poret has been designing, analyzing and conducting consumer surveys for over a decade.  (DX 121, App. A.)[15]  He has provided expert testimony regarding survey research in over 60 lawsuits in U.S. district courts including a number raising trademark and trade dress claims.  (<u>Id.</u>)  He has submitted an expert report in this matter (DX 121).  The Court accepts that report as his direct testimony. He has also submitted a trial declaration in rebuttal to the trial declaration of Mark

---

[15] Poret holds a J.D. from Harvard Law School, graduated Phi Beta Kappa from Union College with a B.S. in mathematics, and holds an M.A. from SUNY, Albany in Mathematics. (DX 121, App. A.)

Keegan, proffered by Flushing Bank in this matter. (ECF No. 66; the Keegan declarations are ECF Nos. 55, 87.)[16]

Poret conducted a consumer survey, the methodology of which is discussed extensively in his report.  In sum, he conducted an online survey of consumers likely to use a mobile bank account or an online banking service in the next six months. (DX 121, p. 21.) To obtain participants, he utilized an online consumer panel and also sent email invitations. The interview period lasted from July 11-17, 2014. (Id. at p. 26.)  The survey appropriately showed a brief tv segment from "Project Runway."  (Id. at p. 6.)  This mirrored the real world concern that consumers exposed, inter alia, to GoBank through "Project Runway" would thereafter associate iGObanking with that service.[17]

The Court credits the finding of Poret that the net confusion rate between GOBANK and IGOBANKING was only 1.6% (or ranged between 1.6% and 2.4%). (Id. at 33.)  The low rate of confusion documented in Poret's survey supports the

---

[16] Flushing Bank has moved, pursuant to Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), to preclude Poret's expert report and survey results as fundamentally flawed and unreliable. (ECF No. 53.)  Flushing Bank's motion relies on the criticisms of the Poret survey identified by its own expert, Mark Keegan.  The Court does not find that Keegan's background in surveys is sufficiently deep or tested to provide a reliable basis for his criticisms.  The Court is troubled by what appears to be a large amount of "cutting and pasting" between a prior report and this report, potentially reflecting off-the-shelf criticism.  Finally, the Court has carefully reviewed the criticisms against the Poret report and Poret's explanations for his methodology.  The Court finds that his methodology, in this particular reverse confusion case, was sound.  The Court denies the motion to preclude.

[17] The Court does not credit Keegan's criticism that this was merely a "memory test," as respondents were asked a series of questions which appropriately sought to identify associations with a known base; it is unclear how Keegan would have designed an adequate survey to test that which needed to be tested here.

Court's finding that an appreciable number of consumers are unlikely to be confused.[18]

H.  . Third Party Usage and Enforcement Efforts

Other third party banks have also chosen to use the phrase "GoBank" or "GoBanking" as a brand to convey the activity of "going banking."  (See, e.g., ECF No. 73., Exh. 10 (Doll Tr.) 12:9-13:9, 14:9-13; Id., Exh. 7 (Flann Tr.) 24:17-20, 25:13-15; Id., Exh. 8 (Weyker Tr.) 59:19-25, 60:2-7; DX 13.)  Representatives of other banks that had used some version of "GoBank" or "Go Banking" were deposed in this action.  All such representatives testified that they were not aware of any consumer confusion between their services and those of Flushing Bank.  (ECF No. 73, Exh. 10 (Doll Tr.) 64:2-10; Id., Exh. 7 (Flann Tr.) 37:6-10; Id., Exh. 8 (Weyker Tr.) 61:22-64:14; Id., Exh. 9 (Ollenburg Tr.) 61:7-19.)  The Court finds this evidence probative of whether an appreciable number of consumers are likely to confuse plaintiff's and defendant's respective marks as well.

Third party usage of the words "Go" and "Bank" together and in commerce and for banking services has proceeded for years without serious objection or consistent enforcement efforts by Flushing Bank.  (DXs 4, 6, 7, 9, 10, 13, 14, 166; ECF No. 73, Exh. 7 (Flann Tr.) 21:20-22:9; 36:18-25; Id., Exh. 8 (Weyker Tr.) 14:5-13; 40:12-14; 40:24-41:19; 42:1-20;  57:6-10, 57:15-20; 64:16-20; ECF No. 117, Exh. K (Tiffany Tr.) 36:17-19; 37:18-38:2; 49:10-15; 55:24-56:4; 101:14-25.)  Other than this

---

[18] The low likelihood of confusion is perhaps understandable given the amount of time and attention most consumers give to establishing a banking relationship.  (ECF No. 117, Exh. C (Franz Tr.) 79:14-83:3.)

lawsuit, Flushing Bank has made sporadic and desultory efforts to prevent other third parties from using various forms of "GoBanking."  (Pine River Valley Bank, "GoBank service," DXs 3, 4, 8; ECF No. 73, Exh. 7 (Flann Tr.) 13:23-14:4, 18:7-10, 21:20-22:9, 36:12-17; 37:1-5; ECF No. 117, Exh. K (Tiffany Tr.) 44:14-18, 54:12-19; Bank First National, "GOBANK," DXs 9, 13, 15, 16, 42; ECF No. 73, Exh. 8 (Weyker Tr.) 14:5-13, 57:6-20, 61:1-65:1, ECF No. 117, Exh. K (Tiffany Tr.) 36:17-19, 37:18-39:21; Modern Woodmen Bank, "GOBANKING," DXs 17, 23, 26, 29, 48; ECF No. 73, Exh. 9 (Ollenburg Tr.) 13:11-14:12, 23:2-12, 58:16-20; 59:19-60:8; Valley Bank & Trust Co., "Go Banking," DXs 31, 36; ECF No. 73, Exh. 10 (Doll Tr.) 12:9-14:13, 58:15-59:13; ECF No. 117, Exh. K (Tiffany Tr.) 49:10-50:5; North Valley Bank, "Go! Banking," DXs 45, 122; ECF No. 117, Exh. K (Tiffany Tr.) 55:24-56:14; Shelby County State Bank, "Go Bank," DX 46, 122; ECF No. 117, Exh. K (Tiffany Tr.) 59:6-60:15, 100:12-101:1, 101:14-25,  102:1-102:8.)

For instance, Pine River Valley Bank has used the term GoBank continuously since February 2013. (ECF No. 73, Exh. 7 (Flann Tr.) 21:20-22:9.)  It offers online banking services under the words "GoBank" and "Go Bank."  (Id. 13:23-14:4; 18:7-23; DX 4 at GD035174.)  Bank First National has used a GOBANK logo since the middle of 2010 and uses the GOBANK term in marketing materials. (ECF No. 73, Exh. 8 (Weyker Tr.) 16:16-17:1; 39:7-10; DX 9.)  The bank has a "goBankFirstNational.com" website that it has run since 2010. (ECF No. 73, Exh. 8 (Weyker Tr.) 57:15-20; DXs 9, 13.)  Modern Woodmen of America has a federally registered trademark for its GOBanking logo for use with "banking services; credit

card services; [and] savings bank services." (DX 17.)   It first started using the GOBanking logo in February 2013. (ECF No. 73, Exh. 9 (Ollenburg Tr.) 13:11-14:2; DX 17.)  Modern Woodmen sends out mailings with its GOBanking marks to states across the country.  (ECF No. 73, Exh. 9 (Ollenburg Tr.) 30:15-34:18; 35:6-17; 38:19-39:12; 44:14-45:2; DXs 19-22.)  The company also has reserved the internet address "go-banking.net." (ECF No. 73, Exh. 9 (Ollenburg Tr.) 81:20-24.)  Valley Bank & Trust Co. uses the "Go Banking" phrase and in logo form.  (ECF No. 73, Exh. 10 (Doll Tr.) 13:10-13.)  The bank introduced the Go Banking term to its customers in 2012, and the logo in 2013.  (Id. 12:9-14:13; DX 31.)  North Valley Bank has used its GO! BANKING mark since 2010. (DX 122 at GD03125; GD035228-229.) Shelby County State Bank has offered GO BANK as student checking accounts since 2008. (DX 122 at GD035127.)  The bank maintains a website at www.gobankscsb.com. (DX 122 at GD035127.)

There is no evidence of any instances of confusion between Flushing Bank's iGObanking services and the services offered by these other third parties, and affirmative evidence that there has been no such confusion.   (See, e.g., ECF No. 73, Exh. 7 (Flann Tr.) 37:6-10; Id., Exh. 9 (Ollenburg Tr.) 61:7-19; Id., Exh. 10 (Doll Tr.) 64:2-10.)

III.   CONCLUSIONS OF LAW

    A.   Legal Standard for Lanham Act Claims

Claims under 15 U.S.C. §§ 1114 and § 1125(a) are governed by the same standard: plaintiff must demonstrate that it has a valid mark entitled to protection

and that an appreciable number of ordinarily prudent purchasers are likely to be misled, or simply confused, as to the source of the goods in question.  W.W.W. Pharmaceuticals Co. v. Gillette Co., 984 F.2d 567, 570-71 (2d Cir. 1993); McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1130 (2d Cir. 1979); Mushroom Makers, 580 F.2d at 47.  Here, Flushing Bank has received certificates of incontestability for the marks at issue.  (ECF No. 59, (Tiffany Decl.) ¶ 112.)  The marks are therefore presumptively distinctive and entitled to protection. McGregor-Doniger, 599 F.2d at 1132.

Under the Lanham Act, confusion is ordinarily the misimpression that the senior user is the source of the junior user's goods; reverse confusion is the misimpression that the junior user is the source of the senior user's goods.  Banff, Ltd. v. Federated Dep't Stores, Inc., 841 F.2d 486, 490 (2d Cir. 1988).  The Lanham Act protects against reverse confusion in order to prevent a situation in which "consumers initially aware of [the junior user's goods] may believe that [the senior user's] mark they later encounter originates with [the junior user].  These consumers may consider [the senior user] an unauthorized infringer, and [the junior user's] use of the mark may in that way injure [the senior user's] reputation and impair its good will."  Id.; see also, W.W.W. Pharm., 984 F.2d at 571 ("Reverse confusion has been thought to injure the reputation of the prior user of the mark by causing potential customers to consider it a trademark infringer.").

The key inquiry is whether there is a likelihood of confusion; this is the second prong of the Lanham Act standard.  The likelihood of confusion analysis is

typically guided by the eight factor balancing test set forth in <u>Polaroid Corp. v. Polarad Elecs. Corp.</u>, 287 F.2d 492, 495 (2d Cir. 1961).  The eight factors are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.  <u>Polaroid</u>, 287 F.2d at 495; <u>Star Indus.</u>, 412 F.3d at 384.  "[C]ourts generally should not treat any single factor as dispositive. . . .  Instead, the court should focus on the ultimate question of whether consumers are likely to be confused."  <u>Playtex Prods., Inc. v. Ga.-Pac. Corp.</u>, 390 F.3d 158, 162 (2d Cir. 2004) (internal quotation marks omitted).  "The Second Circuit has suggested that the first three <u>Polaroid</u> factors—strength, similarity of marks, and proximity of products—are 'perhaps the most significant in determining the likelihood of confusion.'"  <u>GMA Accessories, Inc. v. Croscill, Inc.</u>, No. 06 Civ. 6236 (GEL), 2008 WL 591803, at *3 (S.D.N.Y. Mar. 3, 2008) (quoting <u>Mobil Oil Corp. v. Pegasus Petroleum Corp.</u>, 818 F.2d 254, 258 (2d Cir. 1987)).  "This evaluation is not a 'mechanical process', instead, we focus on the 'ultimate question of whether consumers are likely to be confused.'"  <u>J.T. Colby & Co. v. Apple, Inc.</u>, 586 F. App'x 8, 10 (2d Cir. 2014) (quoting <u>Nabisco, Inc. v. Warner–Lambert Co.</u>, 220 F.3d 43, 46 (2d Cir. 2000)).  The crucial issue "is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are

likely to be misled, or indeed simply confused, as to the source of the goods in question." <u>Savin Corp.</u>, 391 F.3d at 456 (quoting <u>Mushroom Makers</u>, 580 F.2d at 47).

The Court has evaluated each of the <u>Polaroid</u> factors below.

Factor 1:  Strength of the Mark

The first <u>Polaroid</u> factor, strength of the mark, refers to the distinctiveness of the mark, or more precisely, "its tendency to identify the goods sold under the mark as emanating from a particular…source." <u>Banff</u>, 841 F.2d at 491 (omission in original) (quoting <u>McGregor-Doniger</u>, 599 F.2d at 1131).  To gauge the inherent distinctiveness of a mark, courts consider the extent to which the mark falls within four categories: generic, descriptive, suggestive, and arbitrary or fanciful.  <u>W.W.W.</u> <u>Pharm.</u>, 984 F.2d at 572; <u>see also</u> <u>Abercrombie & Fitch Co. v. Hunting World, Inc.</u>, 537 F.2d 4, 9 (2d Cir. 1976).  While these categories are useful to determine the strength of a mark, they are not dispositive.  "[T]he strength of a mark depends ultimately on its distinctiveness, or its origin-indicating quality, in the eyes of the purchasing public." <u>Banff</u>, 841 F.2d at 491 (quoting <u>McGregor-Doniger</u>, 599 F.2d at 1131.)

In contrast with generic marks, which are generally common descriptions for goods and flatly ineligible for protection, descriptive marks describe a product's features, qualities, or ingredients in ordinary language and are potentially protectable.  <u>W.W.W. Pharm.</u>, 984 F.2d at 572.  Because descriptive marks are not inherently distinctive, they may be protected only if "they have acquired secondary

meaning," sometimes refer to as "acquired distinctiveness."  <u>Star Indus.</u>, 412 F.3d at 385.  A suggestive mark employs terms which do not describe but merely suggest features of a mark and thereby require the consumer to use his or her imagination, thought or perception to reach a conclusion as to the nature of the goods.  <u>Thompson Med. Co. v. Pfizer Inc.</u>, 753 F.2d 208, 213 (2d Cir. 1985).[19]  But even a finding of suggestiveness does not necessarily mean that a mark is strong.  <u>See</u> <u>W.W.W. Pharm.</u>, 984 F.2d at 572; <u>Star Indus.</u>, 412 F.3d at 385 ("In the absence of any showing of secondary meaning, suggestive marks are at best moderately strong.").  Here, the determination as to the category into which the Flushing Bank marks fall must occur in the context of the incontestable mark and an uninterrupted use in commerce.  Nevertheless, the Court looks at whether factors suggest a lack of secondary meaning or distinctiveness.

"Once a mark has been classified, the second step in determining strength is to consider its degree of distinctiveness, an inquiry that concerns both the inherent inventiveness of the mark itself and the amount of third-party usage of the term as a mark, especially in the market in question."  <u>Star Indus.</u>, 412 F.3d at 385 (internal quotation marks omitted).  The strength of a mark refers to its ability to uniquely identify the origin or association of the product or service in question with a particular source.  <u>Id.</u> at 384.  "This tendency is strong to the extent that the mark is distinctive, either inherently or by virtue of having acquired secondary meaning."

---

[19] Neither party asserts that the marks at issue here are fanciful or arbitrary.  Such marks are generally eligible for protection without proof of secondary meaning. <u>Abercrombie & Fitch</u>, 537 F.2d at 11.

Id. (citing Savin, 391 F.3d at 457).  Even a common mark may warrant protection if it has achieved distinctiveness in the marketplace.  Brennan's, Inc. v. Brennan's Rest., L.L.C., 360 F.3d 125, 132 (2d Cir. 2004).  To assess whether such distinctiveness has been achieved, a court looks at whether the relevant consumer group – actual and potential consumers – recognize the mark.  Id.  That a mark has selling power in a limited geographical or commercial area "does not endow it with a secondary meaning for the public generally."  Id. at 133 (quoting Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc., 875 F.2d 1026, 1030 (2d Cir. 1989)).  Use of a significant element of a mark by third parties operating in the same market segment weighs against distinctiveness.  See Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 744 (2d Cir. 1998) ("'Streetwise' is not particularly distinctive in the marketplace.  Other map manufacturers have used the word 'street' in their product's names.").

In a reverse confusion case such as this, strength of mark favors the senior user when the senior user's mark is inherently distinctive and "where the junior user is apt to drown out the moderate success of the senior user."  THOIP v. Walt Disney Co., 736 F. Supp. 2d 689, 694 (S.D.N.Y. 2010); see also First Nat'l Bank of Omaha, Inc. v. Mastercard Int'l, Inc., No. 03 Civ. 707 (DLC), 2004 WL 1575396, at *12 (S.D.N.Y. July 15, 2004) ("For both forward and reverse confusion claims, a plaintiff with a conceptually weak mark is less likely to prevail.  A plaintiff with a mark that is commercially weak, however, is likely to succeed in establishing reverse confusion, particularly against a defendant with a far stronger mark.")

(emphasis added, citation omitted).    In these cases it is proper to examine the

strength of the junior user's mark in order to determine whether it has saturated

the marketplace.  Courts have recognized, however, that there are limits:

> [P]art of what entitles a mark to protection is its ability to serve as an
> indicator of origin.  Accordingly, to the extent a senior user has
> invested so little in its mark that it has failed to create an association
> in the minds of consumers between the mark and a source, there is
> correspondingly less reason to protect the mark.  After all, "[t]he chief
> danger inherent in recognizing reverse confusion claims is that
> innovative junior users, who have invested heavily in promoting a
> particular mark, will suddenly find their use of the mark blocked by
> plaintiffs who have not invested in, or promoted, their own marks."

J.T. Colby & Co., Inc. v. Apple Inc., No. 11 Civ. 4060 (DLC), 2013 WL 1903883, at

*16 (S.D.N.Y. May 8, 2013), aff'd 586 F. App'x 8 (2d Cir. 2014) (alteration in

original) (quoting A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d

198, 228 (3d Cir. 2000)).

The marks at issue here – iGObanking and its logo – may be classified as

generic or, at most, descriptive.  The words describe the actions to be taken – that is

precisely what the testimony of Flushing Bank's witnesses indicated they intended.

The words themselves – "I" and "go" and "banking" – literally describe the service.

To the extent the lower case "i" invokes the Internet, that adds a slightly descriptive

element.  On balance, the Court finds that even if considered descriptive, Flushing

Bank's marks are entitled only to weak protection.

The next question for the Court is whether Flushing Bank's marks have

acquired an association with particular goods or services.  Here, there is insufficient

evidence to find that they have.  Apart from the Flushing Bank witnesses

themselves, there is no evidence that the iGObanking service has acquired any secondary meaning at all. The Second Circuit has explained that "[s]econdary meaning is a question of fact" determined by six relevant factors: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." Erchonia Corp. v. Bissoon, 410 F. App'x 416, 418 (2d Cir. 2011) (quoting Centaur Commc'ns v. A/S/M Commc'ns, 830 F.2d 1217, 1222 (2d Cir. 1987)).

Flushing Bank has failed to adduce sufficient evidence to support strength in its marks. It is certainly true, as the facts set forth above demonstrate, that the phrase "iGObanking" is designed to, and does in fact, convey the action of a person accessing banking services over the Internet. But Flushing Bank has not undertaken significant or serious efforts to associate that phrase with its particular online banking services in the minds of online banking consumers generally. The record is remarkably light of any evidence of brand awareness for the iGObanking services.

In a reverse confusion case, such as this one, the concern is that consumers may believe that the junior and better-known mark is the source of the senior user's goods. Banff, 841 F.2d at 490. There is significant evidence in the record that Green Dot saturated the market with advertising for GoBank. That is not synonymous, however, with product association. It is not at all clear that online banking has a particular association with GoBank, despite its advertising efforts. Certainly its

advertising has led to a certain amount of success – but Flushing Bank has not proffered evidence of widespread brand awareness and association, such that customers might mistakenly view iGObanking as an infringing service.

As the iGObanking mark has neither particular strength nor distinctiveness, this factor is strongly in favor of Green Dot and against Flushing Bank.

Factor 2:  Similarity of Marks

"When evaluating the similarity of marks, courts consider the overall impression created by a mark."  Brennan's, Inc., 360 F.3d at 133; see also Banff, 841 F.2d at 492; Paco Rabanne Parfums, S.A. v. Norco Enters. Inc., 680 F.2d 891, 893 (2d Cir. 1982).  A court is to consider marks as a whole, and "juxtaposing fragments of each mark does not aid in deciding whether the compared marks are confusingly similar."  Brennan's, Inc., 360 F.3d at 133.  In evaluating similarity, a court looks at how a mark as a whole sounds, looks and feels – reviewing the size of a mark, design of a logo, the typeface, how a word sounds when spoken.  W.W.W. Pharm., 984 F.2d at 573; McGregor, 599 F.2d at 1133.  For example, the Second Circuit found that the similarities between "B Wear" and "Bee Wear," both presented in standard typestyle, are "so obvious and strong that the marks clearly create the same overall impression to retail consumers."  Banff, 841 F.2d at 492 (internal quotation marks omitted).  However, two names may sound similar and nonetheless not be confusingly similar, given the context in which the purchaser sees them.  See Streetwise Maps, 159 F.3d at 744 (reversing a finding of similarity).  Factors which courts consider in this regard include mode of presentation, typeface, inclusion of

additional words, dress colors, and associated tie-ins, such as a mascot.  <u>See, e.g.</u>, <u>id.</u>
(evaluating, inter alia, dress colors, typefaces, the use of additional words alongside
the mark, and the manner in which a map is folded).

As set forth in the Findings of Facts above, the overall impression of the
iGObanking mark is one of action – a person uses the internet to in fact "go
banking."  The "i" and the "GO" are the predominant features of the mark and logo.
In contrast, Green Dot's "GoBank" conveys the impression of a location.  The mark
functions as a noun, bringing to mind "a" or "the" GoBank.  The predominant word
is "Bank" with "Go" as the lesser word.  The marks therefore convey largely
different impressions: one of personalized action, the other of a bank in a location.

Visually, the logos are quite dissimilar.  iGObanking's logo – iGObanking.com –
focuses on the "i" and "GO."  The word "banking" is all lowercase and appears
secondary.  In contrast, the GoBank logo – GObank – uses the arrow or play
symbol within the word "GO" to point to, and thereby draw the viewer's attention
to, the word "bank." The word "bank" is central to the overall impression.  The logos
also use different colors and the letters in the words are of different thicknesses.  To
the extent they each have a design element associated with the word "go,"
iGObanking's green circle encompasses the word while GoBank's white arrow is
contained within the letter 'o.'  The type font is, however, somewhat similar.

The marks obviously do both make prominent use of the word "go" and share
use of the word "bank" – though iGObanking uses it only in its longer form.  That

added length distinguishes the marks, particularly given Flushing Bank's mixed use of iGObanking and the even longer mark iGObanking.com.

While the marks do share some similarity, they are taken as a whole dissimilar.  They convey different impressions, have different emphases, sound different and look different.  While the words "go" and the root word "bank" do overlap, in the context of the overall mark that similarity is overcome by the more significant dissimilarity between the marks.  Accordingly, this factor tips in Green Dot's favor and against Flushing Bank.

<u>Factors 3 and 4:  Proximity of Products and Bridging the Gap</u>

In determining proximity, courts consider the extent to which the junior and senior users' goods or services compete.  <u>Savin</u>, 391 F.3d at 458; <u>W.W.W. Pharm.</u>, 984 F.2d at 573-74; <u>Lang v. Retirement Living Pub. Co.</u>, 949 F.2d 576, 582 (2d Cir. 1991).  The use or purpose of the goods or services, their geographic distribution, and their market position or audience appeal are all factors which may suggest a particular degree of proximity.  <u>W.W.W. Pharm.</u>, 984 F.2d at 573-74; <u>C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.</u>, 753 F.2d 14, 18 (2d Cir. 1985).  In assessing product proximity, courts look at the nature of the product itself as well as the structure of the market.  <u>Brennan's</u>, 360 F.3d at 134; <u>Vitarroz Corp. v. Borden, Inc.</u>, 644 F.2d 960, 967 (2d Cir. 1981).  Competitive proximity has both product-characteristic and geographic components.  <u>Brennan</u>, 360 F.3d at 134.  Both elements seek to elucidate whether the two products or services in question have the same client base.  <u>Id.</u>  Products and services offered for sale and advertised

through different distribution channels are less likely to be confused.  See <u>Charles of the Ritz Grp. Ltd. v. Quality King Distrib., Inc.</u>, 832 F.2d 1317, 1322 (2d Cir. 1987); <u>Akiro LLC v. House of Cheatham, Inc.</u>, 946 F. Supp. 2d 324, 335-36 (S.D.N.Y. 2013).

To establish likelihood of confusion, competing goods require less proof under the <u>Polaroid</u> factors than noncompeting items.  <u>Banff</u>, 841 F.2d at 492; <u>Plus Prods. v. Plus Discount Foods, Inc.</u>, 722 F.2d 999, 1008-09 (2d Cir. 1983). "Bridging the gap" refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so.  <u>Star Indus.</u>, 412 F.3d at 387; <u>Lang</u>, 949 F.2d at 582.  The "bridging the gap" factor is designed to preserve the interest of the senior user in being able to enter a related field at some future time.  <u>Savin</u>, 391 F.3d at 459-60.

Flushing Bank and Green Dot both provide banking services over the Internet.  Viewed at a high level, it would therefore appear that they are directly competitive with one another.  A closer look at the evidence, however, undercuts this view.  The evidence in the record demonstrates that the customer bases each company serves differ from one another.  Flushing Bank tends towards more affluent customers and Green Dot towards those with less income and lower household incomes.  There does, however, appear to be some overlap in the target demographic.

Green Dot and Flushing Bank agree that whatever overlap in target customer base they may have, they approach that base through very different

advertising media.  Green Dot uses association with brick and mortar stores such as Wal-Mart; Flushing Bank does not.  Green Dot has used a tie-in with a reality television show, Project Runway; Flushing Bank does not – and indeed has never advertised on television.

In terms of product offerings, those appear to be largely overlapping in a gross sense.  Both companies associate their marks with online banking services and promote their interest rates and costs associated with checking and debit account maintenance.  There is insufficient evidence in the record to allow the Court to draw a conclusion as to whether the services are in fact competitive when looked at closely.

As the Court does not have sufficient evidence to establish the extent to which the services differ and therefore the existence of any gap to bridge, it cannot make a determination in Flushing Bank's favor on this factor.  It is axiomatic that it is the plaintiff that bears the burden of demonstrating a favorable determination on the Polaroid factors.  See Star Indus., 412 F.3d at 391; Mushroom Makers, 580 F.2d at 48   The Court views these factors as neutral – tipping in favor of neither party

### Factor 5:  Actual Consumer Confusion

Consumer confusion can involve mistaking the origin of a particular product or service, or whether there is an affiliation between the two of them.  See Star Indus., 412 F.3d at 384.  Actual confusion need not be shown in order to prevail on a Lanham Act claim.  Savin Corp., 391 F.3d at 459; Lois Sportswear, 799 F.2d at 875.  However, there can be no more positive or substantial proof of the likelihood of

confusion than proof of actual confusion.  While "very little proof of actual confusion would be necessary to prove the likelihood of confusion, an almost overwhelming amount of such proof would be necessary to refute such proof."  Savin, 391 F.3d at 459 (quoting World Carpets, Inc. v. Dick Littrell's New World Carpets, 438 F.2d 482, 489 (5th Cir. 1971)).  This does not mean, however, that a single incident – or even a small number of incidents – of confusion in light of the total course of competition requires a finding in plaintiff's favor.  See, e.g., id. (a single anecdote is insufficient); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 269 F.3d 114, 123-24 (2d Cir. 2001) ("[W]e do not believe the district court erred in finding that two anecdotes of confusion over the entire course of competition constituted de minimis evidence insufficient to raise triable issues."); C.L.A.S.S. Promotions, 753 F.2d at 18 (two isolated instances of actual confusion were "insignificant when contrasted to the hundreds of thousands of magazines sold over the years"); Inc. Publ'g Corp. v. Manhattan Magazine, Inc., 616 F. Supp. 370, 386-90 (S.D.N.Y. 1985), aff'd without op., 788 F.2d 3 (2d Cir. 1986) ("anecdotal evidence" of misdirected telephone calls and inquiries were not impressive because they are not proof of confusion of consumers contemplating a purchase and because similarity of marks alone may not have prompted the calls); George & Co. LLC v. Imagination Entm't Ltd., 575 F. 3d 383, 398 (4th Cir. 2009) (four instances of actual confusion was de minimis when measured against significant sales volume);  Nautilus Grp., Inc. v. ICON Health and Fitness, Inc., 372 F.3d 1330, 1338 (Fed. Cir. 2004) (four misdirected phone calls out of thousands is a "relatively small number" and is "too unreliable to establish

actual confusion"); Petro Shopping Centers L.P. v. James River Petroleum, 130 F.3d 88, 95 (4th Cir. 1997) (when measured against a substantial volume of commerce, isolated instances of actual confusion are de minimis); Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr., 109 F.3d 275, 284 (6th Cir. 1997) (isolated instances of actual confusion when there has been extensive advertising do not always indicate an increased likelihood of confusion and in fact may indicate the opposite); Door Sys., Inc. v. Pro-Line Door Sys., Inc., 83 F.3d 169, 173 (7th Cir. 1996) ("[T]he plaintiff's evidence that two consumers (out of how many thousands?) may have been misled cannot by itself be thought to create a contestable issue of likelihood of confusion even if the evidence, which is hearsay, is admissible and credible, which we doubt."); Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc., 931 F.2d 1100, 1110 (6th Cir. 1991) (where parties have advertised extensively and are doing business in the same area, isolated instances of actual confusion are not conclusive or entitled to great weight in the determination).

Here, as set forth in the Findings of Fact above, there is some evidence of actual confusion.  However, those instances of confusion must be put into context. Flushing Bank has over 17,000 online accounts.  (ECF No. 59 (Tiffany Decl.) ¶ 39; PX 30.) A dozen or so inquiries spread over a period of time – and during the pendency of a litigation in which it can be assumed the company was actively on the look-out for any instances of actual confusion –are minimal.

Parties often submit surveys to demonstrate actual confusion.  Indeed, "the absence of surveys is evidence that actual confusion cannot be shown," although "a

46

trier of fact may still conclude that actual confusion exists in the absence of such evidence, so long as there is other evidence of actual confusion." Sports Auth., Inc. v. Prime Hosp. Corp., 89 F.3d 955, 964 (2d Cir. 1996); see also Merriam–Webster, Inc. v. Random House, Inc., 35 F.3d 65, 74 (2d Cir. 1994) ("The lack of survey evidence counts against finding actual confusion.").  "As long as an expert survey possesses sufficient 'circumstantial guarantees of trustworthiness,' a court may properly rely upon it to establish the likelihood or remoteness of confusion in a trademark dispute." Starter Corp. v. Converse, Inc., 170 F.3d 286, 297 (2d Cir. 1999).  Here, only Green Dot conducted a survey.  The Court has carefully reviewed that survey as well as the criticisms of that survey by Keegan, an expert offered by Flushing Bank.  The survey is grounded in a reasonable methodology.  In light of all of the evidence as to how little brand recognition Flushing Bank's mark has obtained, the survey's results documenting only a 1.6-2.6% chance of confusion are unsurprising.  The Court credits those results.  They demonstrate further that the likelihood of confusion here is de minimis.

Factor 6:  Good/Bad Faith In Adopting The Mark

The good faith factor questions whether the junior user adopted the mark "with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'" W.W.W. Pharm., 984 F.2d at 575 (quoting Lang, 949 F.2d at 583).

Mere awareness of the senior user's mark does not necessarily demonstrate bad faith.  Instead, the Court looks at the junior user's intent.  "Selection of a mark

that reflects the product's characteristics, request for a trademark search and reliance on the advice of counsel are factors that support a finding of good faith." Lang, 949 F.2d at 583. The Court asks: did the junior user select the mark with an honestly held belief that its use would be non-infringing? Did the junior user choose the mark because it was descriptive of its good or service or the product's characteristics? Did the junior user perform a trademark search and did it rely on the advice of counsel? See W.W.W. Pharm., 984 F.2d at 575.

Green Dot knew of Flushing Bank's marks at the time it adopted its own mark. In many circumstances this could lead to a finding of bad faith adoption. Here, however, the evidence counters that possibility. Green Dot has adduced a host of persuasive evidence that while it knew of Flushing Bank's mark, it also knew that other companies used similar marks. As set forth above, a number of those companies testified in this proceeding. There is no evidence that Green Dot proceeded with its usage in order to try and usurp any of Flushing Bank's goodwill or customer base. As discussed, the target customer demographics are quite different. Given the lack of real distinctiveness of the mark, the difference in targeted customers, and the usage by other third parties, the Court finds that Green Dot proceeded in a good faith. This factor tips in favor of Green Dot and against Flushing Bank.

<u>Factor 7: Quality of Defendant's Product</u>

In trademark infringement law there are two issues with regard to the quality of the junior user's goods that are at some tension with one another. If the

quality of a junior user's product or service is low compared to the senior user, "there is an increased chance of actual injury when there is confusion." <u>Savin</u>, 391 F.3d at 461.  In short, the association with the inferior brand could tarnish the senior user's brand.  <u>Id.</u>

However, a marked difference in the quality of the product or service may actually reduce the likelihood of confusion – "because buyers will be less likely to assume that the senior user whose product is high-quality will have produced the lesser-quality products of the junior user."  <u>Id.</u>  Conversely, there is a greater likelihood of confusion if the products are of approximately the same quality, but less possibility of dilution.  <u>Id.</u>

Here, the evidence is neutral or tips toward Green Dot in terms of quality of service.  The evidence has focused on the quality of the online offering in terms of ease of use and attractiveness of the website.  There is inadequate evidence in the record to determine whether the quality of the banking services themselves as between Green Dot and Flushing are similar.  On balance, this factor is neutral between them.

<u>Factor 8:  Buyer Sophistication</u>

The more sophisticated or discriminating the purchaser, the lower the likelihood of confusion.  <u>Id.</u>  Buyer sophistication indicates that a discriminating purchaser will examine the product or service carefully, dispelling any initial questions as to the origin or association of the product.  Accordingly, likelihood of confusion must be assessed by examining the level of sophistication of the relevant

purchasers.  W.W.W. Pharm., 984 F.2d at 575.  Courts consider what the general
impression of a purchaser would be, "buying under the normally prevalent
conditions of the market and giving the attention such purchasers usually give in
buying that class of goods."  McGregor-Doniger, 599 F.2d at 1137.  This factor – as
is true with regard to the other factors as well – intersects with actual confusion.
Like actual confusion, consumer sophistication "may be proved by direct evidence
such as expert opinions or surveys."  Star Indus., 412 F.3d at 390.  In some cases,
courts reach a conclusion about consumer sophistication based solely on the nature
of the product or its price.  See, e.g., Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317
F.3d 209, 219 (2d Cir. 2003) (consumer sophistication is generally low in dealing
with inexpensive supermarket products).

    This final factor, buyer sophistication, favors Green Dot.  There is evidence in
the record that consumers take choosing a banking service seriously.  It is not an
impulse purchase.  Indeed, the record evidence here shows that when a customer
seeks to open a bank account he or she must go through a process, filling out an
application and being approved.  There is, in short, plenty of time and opportunity
for a consumer to learn all of the relevant information regarding product origination
and association.

### Summary of the Polaroid Factors

    As discussed above, five of the eight Polaroid factors cut in favor of Green
Dot, while the remaining three are neutral and do not tend to support either party
in a particularly strong way.  This tallying of factors, however, understates the

extent to which Flushing Bank has failed to prove its reverse confusion claim.
Flushing Bank's iGObanking mark is not strong and the relevant marks are, on the
whole, dissimilar.  These determinations are supported by the rest of the <u>Polaroid</u>
factors and compel the conclusion that Green Dot has not infringed Flushing Bank's
trademark.

      B.    <u>Cancellation of the Mark</u>

Green Dot seeks cancellation of the Flushing Bank marks that are the
subject of this Opinion.  Flushing Bank has sought a declaratory judgment on the
same topic.

    A third party may petition to cancel a trademark registration on the ground
that it was fraudulently obtained.  15 U.S.C. § 1064(3); <u>see also</u> <u>In re Bose Corp.</u>,
580 F.3d 1240, 1243 (Fed. Cir. 2009).  "Fraud in procuring a trademark registration
or renewal occurs when an applicant knowingly makes false, material
representations of fact in connection with his application."  <u>Bose</u>, 580 F.3d at 1243
(quoting <u>Torres v. Cantine Torresella S.r.l</u>, 808 F.2d 46, 48 (Fed. Cir. 1986)).  A
party seeking cancellation on this ground must prove fraud by clear and convincing
evidence.  <u>Orient Exp. Trading Co., Ltd. v. Federated Dep't Stores, Inc.</u>, 842 F.2d
650, 653 (2d Cir. 1988).  "The allegedly fraudulent statements may not be the
product of mere error or inadvertence, but must indicate a 'deliberate attempt to
mislead the [USPTO].'"  <u>Id.</u> (quoting <u>Money Store v. Harriscorp Finance, Inc.</u>, 689
F.2d 666, 670 (7th Cir. 1982)).  Such a statement must pertain to a material fact –
i.e. one that would have affected the USPTO's action on the application.  <u>Id.</u>

Although intent to deceive can be inferred from indirect and circumstantial evidence, "such evidence must still be clear and convincing, and inferences drawn from lesser evidence cannot satisfy the deceptive intent requirement." Star Sci., Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1366 (Fed. Cir. 2008). "There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party.'" Bose, 580 F.3d at 1243 (quoting Smith Int'l, Inc. v. Olin Corp., 209 U.S.P.Q. 1033, 1044 (T.T.A.B. 1981).

Based on the totality of the evidence, the Court finds that Green Dot has failed to carry its burden by clear and convincing evidence that Flushing Bank engaged in fraud in procuring its trademark.[20]

---

[20] Green Dot has similarly failed to prove that it is entitled to attorneys' fees under 15 U.S.C. §§ 1117, 1120, and its request for such fees is therefore denied.

IV.     CONCLUSION

For the reasons set forth above, the Court finds in favor of Green Dot on Flushing Bank's claims, and in favor of Flushing Bank with regard to Green Dot's counterclaim.

The parties shall confer on an appropriate form of judgment and submit one to the Court within 14 days of the date of this order.


        SO ORDERED.

Dated:          New York, New York
                October 5, 2015


                                        _____
                                               KATHERINE B. FORREST
                                               United States District Judge